In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3094

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARK A. BOOKER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 06 CR 50054—**Philip G. Reinhard,** *Judge.*

ARGUED SEPTEMBER 23, 2008—DECIDED AUGUST 28, 2009

Before BAUER, CUDAHY, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Mark Booker was indicted on one count of being a felon in possession of a firearm pursuant to 18 U.S.C. § 922(g)(1). Booker's indictment arose out of events that transpired in 2006 when an officer acting on a witness's tip stopped Booker's van and saw a gun inside. Booker challenges the district court's denial of his motion to suppress. Booker wishes to exclude the gun and his statements to police because

he believes the police lacked reasonable suspicion to stop his vehicle. Booker also challenges his sentence, arguing that his involuntary manslaughter conviction does not qualify as a "crime of violence" under *Begay v. United States*, 128 S. Ct. 1581 (2008). Because the officers did have reasonable suspicion to stop Booker's van, we affirm the district court's denial of the motion to suppress. However, we remand for resentencing because Booker's prior involuntary manslaughter conviction does not qualify as a "crime of violence."

## I. BACKGROUND

On July 27, 2006, at about 11:30 p.m., officers from the Rockford Police Department received a 911 call that shots may have been fired near Furman Street and Arthur Avenue in Rockford, Illinois. Officer James Presley arrived on the scene, and Tywon Tennin flagged him down. Tennin told Officer Presley that his daughter had been pushed earlier in the evening and that in response he went to 818 Furman Street, where the alleged battery had occurred. Tennin stated that when he arrived at the house, the occupants refused to speak to him. A short time later, he returned to the house on Furman with relatives of his daughter. As they approached the house, they spotted several African-American men standing outside, but upon seeing Tennin, the men went inside. Tennin said as he and the relatives stood on the front porch, they heard someone run out of the back of the house. Tennin and the relatives gave chase. At that time, Tennin said he heard a loud bang

that sounded like a gunshot. Tennin did not report seeing a gun or a muzzle flash. Tennin reported to the officer that the men he believed were involved in the battery were no longer at the house. At that moment, he spotted a van in the driveway at 818 Furman. Tennin told Officer Presley, "I think that's the van that they were in." Tennin also described one suspect as being a bald, black male wearing black pants and no shirt. Officer Presley spoke to Tennin's daughter, but did not see any visible signs of injury.

After taking Tennin's statement, Officer Presley put out a radio call that a witness reported a maroon van at 818 Furman Street that may have been involved in a battery. Officer Timothy Campbell, who arrived next on the scene, saw a van matching the description, which contained one Black male who was wearing a hat and a shirt. The van was leaving the driveway at 818 Furman as Officer Campbell and his partner approached. Officer Campbell yelled at the man, who was later identified as Mark Booker, to stop, which he did. Officer Campbell ordered Booker out of the van and patted him down. Another officer peered in the van window and saw the handle of a .22 caliber revolver on the van's floor. The officers then arrested Booker. Once under arrest, Booker admitted the gun belonged to him and said, "I always carry my piece."

Booker filed a motion to suppress the gun and his post-arrest statements, arguing that the police did not have reasonable suspicion to stop his van. The district court denied Booker's suppression motion, concluding

that the officers had reasonable suspicion to stop Booker's van based on Tennin's statement and that the gun was in plain view.

Booker pled guilty, and he reserved his right to appeal the denial of his suppression motion. In the plea agreement, the parties agreed that Booker's base offense level was 24 pursuant to U.S.S.G. § 2K2.1(a)(2) because of a 1997 involuntary manslaughter conviction and a 2001 drug conviction. The plea agreement stated Booker would receive a two-level enhancement because the gun was stolen and a three-level reduction for acceptance of responsibility. The parties agreed his criminal history category was VI and that his Sentencing Guidelines range would be 92 to 115 months in prison. The court sentenced Booker to 102 months' imprisonment, followed by three years of supervised release. Booker appeals.

## II. ANALYSIS

Booker raises two issues on appeal. First, he claims the district court erred in denying his motion to suppress because the officers did not have reasonable suspicion when they stopped his van. Second, he argues the district court committed plain error when it used his involuntary manslaughter conviction to enhance his offense level. We discuss each in turn.

### A. The district court properly determined the officers had reasonable suspicion to justify Booker's stop.

Booker argues Officer Campbell did not have reasonable suspicion to stop his van because the officers had no corroborating evidence that a battery actually occurred or that someone fired a gun. Further, Booker claims the group of men Tennin reported were involved in the battery had already left on foot and that Tennin did not mention a van until he spotted Booker's. Finally, Booker argues he was the only one in the van, which did not match Tennin's description that several men were involved in the incident. Booker contends that if the officers had not stopped his van, they would not have seen the gun inside. Under the fruit of the poisonous tree doctrine of *Wong Sun v. United States*, 371 U.S. 471 (1963), Booker argues the gun and his statements should be suppressed. When reviewing a district court's decision on a motion to suppress, we review legal conclusions de novo and factual determinations for clear error. *United States v. Burks*, 490 F.3d 563, 565 (7th Cir. 2007).

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. CONST. amend. IV. The requirement that officers obtain a warrant from a neutral, detached magistrate ensures individuals receive Fourth Amendment protection. *United States v. Whitaker*, 546 F.3d 902, 906 (7th Cir. 2008). However, police may initiate an investigatory stop—a *Terry* stop— when the officer has reasonable suspicion that a crime occurred. *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968); *United States v. Grogg*, 534 F.3d 807, 810 (7th Cir. 2008). Although

an officer does not need probable cause to conduct an investigatory stop, the brief detention must be based on reasonable suspicion that the stopped individual has or is about to commit a crime. *United States v. LePage*, 477 F.3d 485, 487-88 (7th Cir. 2007). When an officer initiates a *Terry* stop, he must be able to point to "specific and articulable facts" that suggest criminality so that he is not basing his actions on a mere hunch. *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008); *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). Reasonable suspicion must be evaluated in the totality of the circumstances. *United States v. Hicks*, 531 F.3d 555, 558 (7th Cir. 2008).

In denying Booker's motion to suppress, the district court determined that Officer Campbell learned from Officer Presley's radio call that the maroon van may have been involved in the battery. The district court also found it was inconsequential that Booker did not match the description of the suspect Tennin gave because that description was not relayed to Officer Campbell, who made the stop. The trial court also pointed to our decision in *United States v. Drake*, for the proposition that Tennin's statement to police was entitled to greater weight because he was not an anonymous or confidential informant. 456 F.3d 771 (7th Cir. 2006) (concluding reasonable suspicion existed when an identified eyewitness made a 911 call to report an ongoing emergency).

Tennin's statements to police provided the officers with enough information for officers to believe a crime occurred and that Booker may have been involved. First,

police received a 911 call reporting gunshot fire. When Officer Presley arrived, Tennin flagged him down, identified himself, and reported a battery that occurred earlier in the evening. Tennin gave the address of where the battery occurred and the area in which he believed he heard the gunshot. He also gave a specific description of a suspect and pointed out Booker's van as the one that he thought carried the men involved in the battery.

"When a single informant provides the tip that brought police to a *Terry* stop, this court looks to the amount of information given, the degree of reliability, and the extent that the officers can corroborate some of the informant's information*." LePage*, 477 F.3d at 488 (citation omitted). Like the caller in *Drake*, Tennin was not an anonymous informant, and he gave specific details, including describing two crimes that occurred, an address where the crimes occurred and a suspect description. *Drake* differs from this case because the witness in that case reported an ongoing emergency; however, *Drake* nonetheless supports the government's position that reports made by identified witnesses should be given more weight than anonymous callers. *See Drake*, 456 F.3d at 775. Tennin was willing to identify himself to police and have officers speak with his daughter, which differentiates him from other anonymous tipsters whose reports may not give rise to reasonable suspicion. *See United States v. Robinson*, 537 F.3d 798, 802 (7th Cir. 2008) (anonymous sources are less reliable because officers "have no way to hold the source responsible if the information turns out to be fabricated"); *see also Florida v. J.L.*, 529 U.S. 266, 269 (2000) (anonymous tips are less

reliable and "can form basis of reasonable suspicion only if accompanied by specific indicia of reliability"). Tennin also described hearing a gunshot when the men involved in the battery ran from the house. Although this may not have been an ongoing emergency by the time officers arrived on the scene, it certainly was a dangerous situation that officers needed to investigate immediately. "[W]hen the police believe that a crime is in progress (or imminent), action on a lesser degree of probability, or with fewer procedural checks in advance, can be reasonable." *United States v. Wooden*, 551 F.3d 647, 650 (7th Cir. 2008). Tennin's statements provided police with enough articulable facts to believe a crime had just occurred.

Whether the officers had reason to believe Booker was the person who committed the crime is a closer call. Tennin originally stated that the men involved in the battery left on foot, but then pointed out Booker's van as it entered the driveway. Although it is true Tennin said he "thinks" Booker's maroon van was the van the suspects were in, that conjecture does not necessarily make the statement unreliable. Reasonable suspicion is a lower threshold than probable cause and "'does not deal with hard certainties, but with probabilities.'" *United States v. Jerez*, 108 F.3d 684, 693 (7th Cir. 1997) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). Tennin said the suspects left on foot and that a group of men, not just one man, was involved, but that does not change the fact that Tennin told police that he thought the people involved in the incident were in the van Booker was driving. That Booker's appearance did not

exactly match the description offered by Tennin does not help Booker because Officer Campbell was about 200 feet away from Booker when he stopped the van and could not have seen whether Booker was bald under his cap.

Moreover, the fact that Officer Campbell may have been told to answer a call reporting a battery incident, and not a gunshot, is of no significance. The knowledge of one officer can be imputed to another where police officers are communicating with one another. *United States v. Lenoir*, 318 F.3d 725, 728 (7th Cir. 2003). Additionally, both a battery and firing a gun indicate a crime was likely afoot, and the officers had enough information to begin to investigate.

Under the totality of the circumstances, the officers had reasonable suspicion to stop Booker's van. *See Hicks*, 531 F.3d at 558 (determining "reasonable suspicion is an objective inquiry based on the totality of the circumstances known to the officer at the time of the encounter"). So, the gun, which was seen in plain view inside Booker's van, should not be suppressed. *See United States v. Raney*, 342 F.3d 551, 558-59 (7th Cir. 2003) (finding that when an officer who is lawfully present sees an object in plain view, and the incriminating nature of the object is readily apparent, the object can be seized under the plain view doctrine); *see also United States v. Willis*, 37 F.3d 313, 316 (7th Cir. 1994) (officer properly seized gun in plain view following legitimate investigatory stop). The district court also correctly declined to suppress Booker's post-arrest admissions because he made those

statements voluntarily without any questioning by police.[1] *See Miranda v. Arizona*, 384 U.S. 436, 478 (1966) ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.").

**B.   The district court plainly erred in using Booker's prior involuntary manslaughter conviction to enhance his sentence.**

Booker contends the district court should not have used his prior conviction for involuntary manslaughter to increase his offense level because it is not a "crime of violence" under the interpretation of the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B) ("ACCA") mandated by the Supreme Court in *Begay v. United States*, 128 S. Ct. 1581 (2008). At the time of Booker's sentencing, case law made clear that involuntary manslaughter in Illinois was a "crime of violence." However, eight months after the district court sentenced Booker, the Supreme Court decided *Begay*, which altered the landscape of recidivist enhancements. Following *Begay*, we recently held that a conviction for involuntary manslaughter in Illinois does not qualify as a "crime of violence." *United States v. Woods*, No. 07-3851, 2009 WL 2382700 at *10-11 (7th Cir. Aug. 5, 2009). Because that decision controls, Booker is entitled to resentencing. We note that Booker did not object to the enhancement in his plea agreement, but in

[1] Booker does not argue that his statements were involuntary, but only that if the van had not been unlawfully stopped he would not have made such an admission.

light of *Begay* and our recent post-*Begay* precedent, the district court's sentencing enhancement was plain error. *See United States v. High*, No. 08-1970, 2009 WL 2382747, at *2 (7th Cir. Aug. 5, 2009) (under *Begay* and *Woods* the district court's classification of defendant's prior conviction as a "violent felony" was plain error); *see also United States v. Olano*, 507 U.S. 725, 732 (1993).

### III. CONCLUSION

Therefore, we AFFIRM the district court's denial of Booker's motion to suppress, but VACATE his sentence and REMAND for further proceedings consistent with this opinion.