In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 21-1006

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TYSHAWN SWINNEY,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 19-cr-378 — **Edmond E. Chang**, *Judge.*

_____

ARGUED JANUARY 5, 2022 — DECIDED MARCH 16, 2022

_____

Before KANNE, WOOD, and BRENNAN, *Circuit Judges.*

KANNE, *Circuit Judge.* The police received an anonymous 911 call reporting that a man wearing a black skullcap and a black coat with fur had just pulled a large gun out of his pocket and walked into a liquor store. After arriving at the liquor store, officers observed Defendant Tyshawn Swinney wearing the clothing described in the call and patted him down, finding a loaded gun in his coat pocket. Swinney later conditionally pled guilty to possessing a firearm as a felon but

preserved for appeal his argument that the district court should have suppressed the gun because the police did not have reasonable suspicion. We agree with the district court that there was reasonable suspicion to detain Swinney because the anonymous call reliably reported criminal activity. We therefore affirm.

## I. BACKGROUND

Around 9:30 a.m. on November 19, 2018, an anonymous woman called 911 to report a man carrying a firearm. From her location at the Bank of America at 79th and Halsted Streets in Chicago, she told the operator that she had just seen a man on the street take out a gun: "He got a big huge gun, it's in his right pocket. He just pulled it out, a silver gun. It's a 45." She said that the man "scared the shit out of" her when she saw him pull the gun out of his pocket. The caller described the man as wearing blue jeans, white gym shoes, a black skullcap, and a black coat with fur around the collar. She explained that she was "watching him" and narrated his route as he came "up the corner where JJ's Fish is" and walked "across the street towards the liquor store." The caller reiterated that the man was "walking over towards the liquor store" and had his hand "in his right pocket to his coat with a gun in it."

As the 911 operator asked a few follow-up questions, the caller became more animated and exclaimed that the man had "just walked into the liquor store. He walked into Aida. A-I-D-A Liquors. He just walked in there." In total, the call lasted around a minute and a half. The call was recorded, and the caller's cell phone number was captured by the 911 system.

After the 911 call was placed, the following message was relayed over the police radio dispatch system:

> 7900 South on Halsted, a male black, black skullcap, black coat with fur just pulled a large gun out from his pocket. They said that he just walked into the AIDA liquor store, 7900 South on Halsted. The person with a gun … . No number on the callback, no number on the callback. Described as a male black, black skullcap, black coat with fur, and that's all we have.

(The dispatcher identified the man as black even though the caller had provided no information as to the man's race.)

A few minutes after the radio dispatch, several officers from the Chicago Police Department responded to the call and entered the liquor store. They saw Tyshawn Swinney waiting in line at the front register. Swinney was wearing a black coat with a fur-trimmed hood, a black skullcap, blue jeans, and white sneakers. The officers requested Swinney step out of line and patted him down. They found a loaded .45-caliber semiautomatic pistol in Swinney's right coat pocket, which Swinney later told law enforcement he possessed for protection. In Illinois, it is a crime to carry a firearm on a public street and in any place that is licensed to sell alcohol. 720 Ill. Comp. Stat. Ann. 5/24-1(a)(4), (a)(8). The police placed Swinney under arrest.

Swinney was charged with possessing a firearm as a felon under 18 U.S.C. § 922(g)(1). He filed a motion to suppress the gun as the fruit of an illegal search, arguing that the police did not have reasonable suspicion to conduct a *Terry* stop because the anonymous tip did not reliably report that Swinney had committed or was committing a crime. The district court denied his motion, finding that there was enough reliable information to establish reasonable suspicion that Swinney was carrying a gun. Swinney pled guilty but preserved his right to

appeal the denial of his suppression motion. The district court sentenced him to 57 months' imprisonment followed by three years of supervised release. Swinney now appeals the denial of his motion to suppress.[1]

## II. ANALYSIS

Because the facts in this case are undisputed, we review the district court's decision on Swinney's motion to suppress *de novo. See United States v. Williams*, 731 F.3d 678, 683 (7th Cir. 2013).

Police officers may detain a suspect for a brief investigatory stop if they have a "reasonable suspicion based on articulable facts that a crime is about to be or has been committed." *United States v. Carlisle*, 614 F.3d 750, 754 (7th Cir. 2010) (citing *United States v. Wimbush*, 337 F.3d 947, 949 (7th Cir. 2003)); *accord Terry v. Ohio*, 392 U.S. 1, 30 (1968). Whether the facts were enough to support reasonable suspicion "is dependent upon both the content of the information possessed by police and its degree of reliability." *United States v. Adair*, 925 F.3d 931, 935 (7th Cir. 2019) (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)).

When an anonymous caller provides a tip to the police, the tip can serve as the basis for reasonable suspicion if it is "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Florida v. J.L.*, 529 U.S. 266, 272 (2000). Usually, anonymous tips alone "are not reliable enough to establish reasonable suspicion" because they "seldom demonstrate[] the informant's basis of knowledge or

---

[1] We thank law student Claire McNally and supervising attorney Colleen McNichols Ramais of the Office of the Federal Public Defender for their helpful service in this case to Swinney and to the court.

veracity." *United States v. Watson*, 900 F.3d 892, 895 (7th Cir. 2018) (alteration in original) (quoting *J.L.*, 529 U.S. at 270). But the Supreme Court has "identified three factors that make an anonymous tip reliable enough to create reasonable suspicion: the tipster (1) asserts eyewitness knowledge of the reported event; (2) reports contemporaneously with the event; and (3) uses the 911 emergency system, which permits call tracing." *Id.* (citing *Navarette*, 572 U.S. at 399–401).

The district court observed that "it is important to identify exactly what information was actually relayed to the police" when assessing whether the police had reasonable suspicion. Not all the information from the anonymous call was relayed to the police. The police were told by the dispatcher that a male wearing a "black skullcap" and "black coat with fur just pulled a large gun out from his pocket" and "just walked into the AIDA liquor store." The dispatcher omitted the details about the blue jeans and white shoes as well as the caller's location and her real-time narration of the man's movements.

While we agree with the district court that it is a close call, we conclude that this was enough information to establish reasonable suspicion that Swinney was carrying a firearm in a liquor store, in violation of Illinois law.[2] Although the police

---

[2] The government contends that it would have been proper for the district court to rely on information given "to the dispatcher but not transmitted to the officers" under the collective knowledge doctrine. (Appellee's Br. at 18.) That doctrine states that "officers may carry out a stop even if they do not have firsthand knowledge of the facts amounting to reasonable suspicion." *United States v. Eymann*, 962 F.3d 273, 283–84 (7th Cir. 2020) (citing *United States v. Harris*, 585 F.3d 394, 400 (7th Cir. 2009)). Because we conclude that the information relayed to the officers in the radio

did not know that Swinney was wearing blue jeans and white shoes, the dispatcher's description of Swinney's clothing—his "black skullcap" and "black coat with fur"—was sufficiently detailed for the police to be able to identify him. And although the police were not able to listen to the caller's play-by-play account of Swinney's movements, the dispatcher still relayed the immediacy of the caller's account; the police knew that the man "*just* pulled a large gun out of his pocket" and "*just* walked into the AIDA liquor store." (emphasis added.) That language indicated that the caller had observed these actions as they were happening—she both had "eyewitness knowledge of the reported event" and "report[ed] contemporaneously with the event." *Watson*, 900 F.3d at 895 (citing *Navarette*, 572 U.S. at 399–401). The caller also used the 911 emergency system and was thus able to be tracked down, fulfilling the Supreme Court's third and final factor indicating reliability.[3] *See id.*

Swinney maintains that the anonymous tip cannot serve as the basis for reasonable suspicion under the Supreme Court's decision in *J.L.* But unlike this tip, the anonymous tip

_____

dispatch was sufficient, we need not determine whether the 911 operator's knowledge can be imputed to the officers.

[3] Swinney points out that the police did not, in fact, know the call was traceable because they were informed by the dispatcher that there was "no number on the callback." But there is nothing to suggest that the caller did not believe her phone number would be known to the police. And there does not appear to be a dispute that the 911 system still recorded the call and captured the caller's phone number. *See Navarette*, 572 U.S. at 400–01. Thus, the fact that the police knew the caller had used the 911 system supports a finding of reasonable suspicion, because "a reasonable officer could conclude that a false tipster would think twice before using such a system." *Id.* at 401.

in *J.L.* lacked enough indicia of reliability to serve as the basis for reasonable suspicion.

In *J.L.*, an anonymous caller reported to the police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. 529 U.S. at 268. There was no audio recording of the tip, and nothing was known about the informant. *Id.* The police later went to the bus stop and spotted J.L., who matched the informant's description. *Id.* The police stopped and frisked him and found a gun in his pocket. *Id.* He was arrested for possessing a firearm as a minor and moved to suppress the gun as the fruit of an unlawful search. *Id.* at 269. The Supreme Court held that the anonymous tip alone was insufficient to create reasonable suspicion because it was not reliable. *Id.* at 268. The Court reasoned that the informant "neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L.," so the police had no way "to test the informant's knowledge or credibility." *Id.* at 271. In other words, "the tip provided no basis for concluding that the tipster had actually seen the gun." *Navarette*, 572 U.S. at 399 (citing *J.L.*, 529 U.S. at 271).

By contrast, the police here had reason to believe that the tipster had actually seen the gun. The police did not only know what the man was wearing and where he was located. They also knew from the dispatcher that the caller had just seen the man pull a gun out of his pocket and walk into a liquor store, indicating that the tip "was contemporaneous with the observation of criminal activity or made under the stress of excitement caused by a startling event," unlike in *J.L. Navarette*, 572 U.S. at 400. Thus, this tip was more reliable than the one in *J.L.*

Swinney contends that the police's failure to independently corroborate the anonymous tip once they arrived at the liquor store made the stop unconstitutional. He emphasizes that his "behavior was not consistent with an armed and dangerous person and posed no ongoing threat to public safety." (Appellant's Br. at 25.)

It is unclear how the police were supposed to have corroborated that Swinney was carrying a firearm without patting him down, which is what they did. The police were not required to wait for Swinney to pull out his weapon and start shooting, or for any other proof that Swinney was carrying a gun, because they already had reasonable suspicion of that fact. *See Navarette*, 572 U.S. at 404 (noting that an officer who already has reasonable suspicion of criminal activity need not observe the suspect at length in order to personally observe suspicious behavior).

"[T]he absence of additional suspicious conduct" does not "dispel the reasonable suspicion of [criminal activity]." *Id.* at 403. In *Navarette*, for example, the officers responded to a 911 call from an anonymous driver reporting that a truck had run her off the road. *Id.* at 395. The Court held that the 911 call created reasonable suspicion of drunk driving because it had sufficient indicia of reliability and described conduct that was consistent with drunk driving. *Id.* 398–401. It did not matter that the police did not observe the truck being operated recklessly after following it for several minutes, because reasonable suspicion had already been established. *Id.* at 403.

As we explained, the anonymous tip here established reasonable suspicion because it reliably reported a man carrying a gun in a liquor store, which is a crime in Illinois. It does not matter that the police did not see Swinney doing anything

suspicious once they arrived at the scene. Swinney attempts to distinguish *Navarette* by arguing that "[w]hile the officers did not observe additional reckless driving, they verified details not readily observable to third parties like the driver's continued route." (Appellant's Br. at 26.) A suspect's location is merely one of the details—along with his appearance—that serve to identify a particular person. *See J.L.*, 529 U.S. at 272. That the police in *Navarette* confirmed the driver's continued route near the location of the incident instead "suggests that the caller reported the incident soon after she was run off the road." 572 U.S. at 399. The caller's contemporaneous report is one of the salient factors that make a tip reliable enough to establish reasonable suspicion, along with her eyewitness knowledge of the reported event and her use of the 911 system. *See id.* at 399–401. Again, all of these factors were present here.

The police therefore did all the corroboration that was necessary. Our precedent is not to the contrary. It indicates that where, as here, an anonymous tip reliably reports an ongoing crime, additional facts or circumstances are not required to justify a *Terry* stop.

Swinney cites *United States v. Lopez* for the proposition that "[a]bsent verification of illegal conduct alleged in a tip, police acting on anonymous tips must verify details not easily ascertained by public observation or 'future actions of third parties ordinarily not easily predicted.'" 907 F.3d 472, 480 (7th Cir. 2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 245 (1983)). This is just another way of saying that a tip must be reliable before the police can act on it. In *Lopez*, "officers knew the informant's identity but nothing else," including "anything about the informant's reliability." *Id.* at 481. Moreover, the officers'

observations on the day of the seizure "simply did not corroborate, even roughly, the informant's story." *Id.* at 483. Therefore, the informant's tip could not serve as the basis for reasonable suspicion without additional corroboration. *Id.* at 482–83. Here, however, the caller's contemporaneous eyewitness report, conveyed through the 911 system, was reliable, and the officers corroborated the innocuous information provided, including the man's clothing and location at the liquor store.

Swinney maintains that the police are only permitted to forgo an independent corroboration of an anonymous tip when there is an ongoing emergency that risks public safety. That proposition is true as far as it goes. If a tip lacks enough indicia of reliability but reports an ongoing emergency, the police may be allowed to act on it without assessing whether it is reliable. *See, e.g.*, *United States v. Wooden*, 551 F.3d 647, 649 (7th Cir. 2008) ("[A] need for dispatch can make reasonable a stop that would not be reasonable if the police had time to investigate at leisure."); *United States v. Hicks*, 531 F.3d 555, 559 (7th Cir. 2008) (stating that police need not test "predictive information" to evaluate reliability of 911 calls when the call reports an emergency situation). *Wooden* and *Hicks* were decided before the Supreme Court articulated the three factors indicating reliability in *Navarette*. Here, we need not determine whether displaying a gun and bringing it into a liquor store presents an ongoing emergency permitting a lower level of corroboration because the anonymous 911 call was reliable based on those three factors and thus created reasonable suspicion. The police were therefore not required to further corroborate the tip.

### III. CONCLUSION

For these reasons, the district court's judgment is AF-FIRMED.